FLORENCE B. GRUBERT vs. JAMES A. GRUBERT.

Worcester. May 21, 1985. — September 24, 1985.

Present: ARMSTRONG, DREBEN, & SMITH, JJ.

*Divorce and Separation*, Division of property, Alimony, Counsel fees.

On appeal from a judgment of divorce dividing the marital property in half
    and ordering the husband to pay $400 a week in alimony, it was held
    that, in the circumstances, the combination of alimony and equitable
    division of property did not provide a financial arrangement which
    adequately addressed the wife's need for support. [818-819]

COMPLAINT for divorce filed in the Worcester Division of
the Probate and Family Court Department on August 28, 1980.

The case was heard by *Eliot K. Cohen*, J.

*Russell H. Mann, Jr.*, for the plaintiff.

*Robert Christo* for the defendant.

DREBEN, J.  After bitterly contested proceedings, a Probate
Court judge granted the wife a divorce pursuant to G. L. c. 208,
§ 1B, divided the marital property in half, and ordered the
husband to pay the wife $400 a week in alimony. Despite
scrupulous and careful division of the marital property by the
judge, we conclude that the financial arrangement, taken as a
whole, did not adequately take into account traditional alimony
considerations and resulted in an inequitable award. Accord-
ingly, the judgment must be reversed.

1. *Facts*. We take our facts from the comprehensive findings
of the judge. Our account is detailed in order to show why,
in the circumstances, the financial arrangement is deficient.

The parties were married in 1952 and had six children all
of whom are now adults. Both the husband and wife were
caring and loving parents. The husband was the income earner,
and the wife had primary responsibility in raising the children

and maintaining the home. Twenty-six of the thirty-two years of their marriage were good.[1]

Both parties now have health problems; the husband, age fifty-four, had a heart by-pass operation and has diabetes and hypertension; the wife, age fifty-nine, has high blood pressure and a high cholesterol reading, suffers from anxiety and depression and, because of a recent leg injury, has arthritis in her leg. Before her marriage the wife worked as a dietitian, but she did not have outside employment during most of the marriage. For a few years, prior to 1981, she worked part-time as a retail sales clerk in a clothing store.[2] On one occasion in 1979 she acted as an assistant tour guide for an airline on a trip to China. At the time of trial, she was unemployed.

The husband is a sales representative employed by his own wholly owned corporation. His annual income is in excess of $100,000 a year. The parties, during the latter years of their marriage, maintained a comfortable and "high middle income station in life. They entertained frequently, . . . . ate out, belonged to clubs, enjoyed good clothing and a fine home."

After the parties separated, the husband continued to enjoy "a high middle income station," entertaining extensively and maintaining a boat. His corporation bought him a $22,000 Cadillac. On the other hand, the wife's "station . . . has . . . been lowered. Although she continues to enjoy the benefits of the marital home, she is dependent upon the [husband] for support and obtains some financial assistance from her brother. She is no longer able to maintain her previous life's station, cannot socialize or entertain, and is curtailed in her ability to purchase clothing because of her limited financial resources."[3]

---

[1] The break in their relationship began in 1978 and 1979 when the husband became interested in another woman.

[2] She testified that as a sales clerk she was paid the minimum wage.

[3] At the time of these findings, the wife was receiving $235 a week under an amended temporary support order dated May 12, 1983. She also received twenty dollars a week from a daughter who was living at home. The wife was required to pay for utilities, but the husband was obliged to make the $400 a month mortgage payments on the marital home, and to pay real estate taxes and costs of repairs.

The extent of the husband's finances was explored at trial with great difficulty. He "does not maintain adequate books and records of his corporate or personal income and expenses . . . . The lack of any appropriate accounting system has frustrated the [wife] in her efforts to evaluate [his] business and his income . . . . Likewise it has frustrated the Court in its valuation[] attempt." In addition, "the Court questioned during the course of the trial and continues hereby to question the [husband's] financial credibility."[4]

In determining that the husband's gross annual income was over $100,000 (after business expenses but prior to taxes), the judge took into account the absence of records and the fact that "extensive" sums were paid by the corporation for the husband's personal needs (e.g., personal taxes, etc.). See *Sack* v. *Sack*, 328 Mass. 600, 604 (1952); *Thomsen* v. *Thomsen*, 12 Mass. App. Ct. 1010, 1011 (1981).

The wife challenges the judge's findings as to the husband's income and assets. While the husband's evasiveness and the steady increase in his gross sales[5] would support a finding of

---

[4] A review of the extensive transcript reveals that the husband, through his wholly owned corporation, is a manufacturer's representative for two companies selling components for defense products to Raytheon Corporation. He claimed a total lack of knowledge of the amount of his commissions from these two companies, claimed that he had no way of checking whether the commissions paid to him were accurate, had no record as to the number of bank accounts he had, and did not remember what securities he had sold. He claimed his own corporation did not pay his medical expenses but, when shown an employment agreement, acknowledged that it did. His business account was used for personal expenses, his cancelled checks were unnumbered and were often for large amounts of cash without notation as to purpose. His accountant, because of the lack of records, used a percentage figure for the husband's travel and entertainment expenses.

[5] The gross sales of the husband or, after 1981, of his wholly owned corporation, were as follows:

| | |
|---|---|
| 1980 | $1,326,582 |
| 1981 | $2,672,015 |
| 1982 | $4,202,576 |
| 1983 | $5,122,000 |

In 1980, the joint income of the parties approached $171,000 and, after payment of income taxes, was in excess of $100,000. The husband formed

substantially higher earnings, we cannot say the findings of the judge are clearly erroneous. The judge presided over lengthy hearings, weighed the credibility of the witnesses and discounted much of the husband's testimony. He was not required to discount, as the wife suggests, even more.

The judge's findings, however, appear to be in error as to the husband's after-tax income. Although the judge found his pre-tax income to be in excess of $100,000 per year (after business expenses), or $2,000 a week, he determined the husband's weekly after tax income to be $1,000. In view of the alimony deduction allowed by the Internal Revenue Code and the tax rates, the husband's tax liability would not be $50,000 on an income of $100,000.

Financial statements were filed by both the husband and the wife. The husband claimed weekly expenses of $872, which included some $300 per week for his boat. The judge found, not counting the husband's expenses for the boat, that the husband's weekly income, after taxes, exceeded his needs ($487) by more that $500 per week.[6] The judge accepted the wife's weekly requirements of $313.37 as not inflated. This figure did not include mortgage payments of $93.02 a week which, prior to the judgment now on appeal, were paid by the husband pursuant to a temporary order, see note 3, *supra*, and were reflected on his financial statement. In sum, each of the parties was found to have somewhat similar needs. (H: $487; W: $407, including first mortgage payments).

The assets of the parties (exclusive of the marital home) were determined to be as follows:

---

the corporation in 1981. Although he claimed that his income had gone down since 1980, when asked if the increase in gross sales in 1983 was "an indication to you that your income will be greater in 1983 than it was in 1982," he answered, "Yes, I suppose it will."

[6] In determining the husband's weekly needs, the judge did not count the husband's expenses in connection with his boat as the judge considered them to be of low priority. See *Pagar* v. *Pagar*, 9 Mass. App. Ct. 1, 8 (1980). The figure of $500 for income after expenses was based on the incorrect after-tax income figure.

Husband's assets:

| | | |
|---|---|---:|
| a. | 33 foot boat | $ 42,500 |
| b. | H's Individual Retirement Account (IRA) | 6,762 |
| c. | H's retirement plan | 23,365 |
| d. | Savings Account | 227 |
| e. | H's personal checking account | 985 |
| f. | Corporate business account | 7,318 |
| g. | Loan to a third person | ·3,750 |
| | | $ 84,907[7] |

Wife's assets:

| | | |
|---|---|---:|
| a. | W's IRA (supplied by H.) | $1,700 |
| b. | W's 1977 Plymouth in need of repairs | (No evidence |
| c. | Furniture, furs & jewelry | as to value) |
| d. | W's certificate of deposit | 3,508 |
| | | $ 5,208 |

The judge did not consider the wife's certificate of deposit as marital property since it was an inheritance received from the wife's mother after the marriage had deteriorated.[8] The husband does not argue otherwise. See *Davidson* v. *Davidson*, 19 Mass. App. Ct. 364, 370 & n.8 (1985).

The largest single asset was the family home, which was held jointly by the parties and was valued by the judge at $156,250. The mortgage was determined to be $35,000, and

---

[7] The judge declined to value the 100% stock ownership in the husband's corporation "because of the personal service nature of the [husband's] corporation, his limited health and potential for a loss in business." See note 17, *infra*. Unless all of the income of the corporation was distributed to the husband, the failure to ascribe any value to the corporation seems questionable. The judge also did not value the corporation's Cadillac, "no current value having been testified thereto."

[8] Neither party had any other prospects of inheritance.

the resulting equity $121,250.[9] The marital assets totalled $207,857.[10]

2. *Financial award.* Finding that the parties had contributed equally to the marriage — husband as wage earner and wife as primary caretaker of the children and the home — the judge determined that it would be equitable to divide the marital assets equally. With this in mind, the judge ordered conveyance of the marital home to the wife. Since that asset constituted the major portion of the marital property, he ordered the wife to grant the husband an interest-free second mortgage of $17,321.45 payable in four years.

The judge also thought it equitable to split the wife's remaining counsel's fees in half. She had incurred counsel fees in these proceedings of $29,699.[11] At the time of trial she had paid $5,800 leaving a balance due of $23,899. Although the judge found that it was the husband who "frustrated and thwarted the [wife's] counsel's effort to procure the proper financial information necessary for the preparation of the [wife's] case" and also found that counsel's charge of $100 per hour "was not excessive," he "utiliz[ed] conservative principles" and ordered the husband to pay the wife's counsel one half of the balance remaining due, namely $11,950.

He required the husband to maintain medical insurance for the wife and to be responsible for one half of the wife's uninsured and reasonable medical expenses. As indicated earlier, he also ordered the husband to pay the wife $400 per week in alimony. The wife was required to assume all expenses for the marital home, including the mortgage payments and real

---

[9] Although the wife contests the valuation of the real estate, there was evidence of an even higher figure. The judge could take judicial notice of the fact that real estate values had increased between 1983 and 1984 and was not required to limit the husband to his 1983 estimate of $125,000.

[10]

| H's assets | $ 84,907.00 |
|---|---|
| W's marital assets | 1,700.00 |
| Marital home | 121,250.00 |
| | $207,857.00 |

[11] She had also incurred accountant's fees.

estate taxes and to hold the husband harmless against the first mortgage encumbrance from the date she received title.

The judge's findings and rulings were made on April 30, 1984, and the wife appealed. After the wife had filed her notice of appeal, and after her appeal had been entered in this court, the judge, on the husband's motion under Mass.R.Dom.Rel.P. 60(b) (1975), revised his findings to take into account the fact, which the judge had omitted in his April 30 rulings, that there was a mortgage on the husband's boat of $34,012.75. Consistent with his earlier fifty percent division, the judge increased the husband's second mortgage to $34,327.82.[12]

While the judge made an exactly equal division of the assets, the financial arrangement as a whole shows that the evenhanded treatment was illusory. The wife was placed in a more precarious financial position after equitable division than she would have been under traditional alimony principles. Her debts totalled $82,677 as follows:

| | |
|---|---|
| First mortgage | $ 35,000 |
| Second mortgage | 34,327 |
| Counsel fees | 11,950 |
| Accountant's fees | 1,400 |
| | $ 82,677 [13] |

Although the wife has some equity in the marital home, she is burdened with debts and has only $400 a week in income. This sum covers her car, food, and miscellaneous expenses

---

[12] The revision of the judgment on July 31, 1984, after an appeal had been entered in this court was technically improper. See *Hager* v. *Hager*, 12 Mass. App. Ct. 887-888 (1981). The husband should have applied to this court for leave for the trial judge to enter an order granting relief. See *Wilkinson* v. *Guarino*, 19 Mass. App. Ct. 1021, 1023 n.6, continued at 1024 (1985), and authorities cited, especially 11 Wright and Miller, Federal Practice and Procedure § 2873 (1973).

[13] The husband listed substantial debts on his financial statement. The judge, however, said of a $28,000 loan listed on the husband's financial statement, "[I]f such debt does exist, the repayment thereon is solely dependent on [husband's] own desires." The "loan" was undocumented, had been outstanding for about ten years, and no interest had ever been paid. Other than that loan, the boat mortgage of $34,000 and other boat equipment loans, the husband shows debts of $12,215.

listed on her financial statement and the first mortgage pay-
ments, but leaves nothing to pay taxes or repairs, let alone the
debts to her husband and counsel.

The wife faces a future of insecurity. Her services as a
dietitian, as the judge found, are no longer marketable. She
has no job, and is forced, by the judge's award, to compete
at age fifty-nine with much younger and more energetic per-
sons. She has no retirement benefits other than her $1,700
IRA, and she has not many years of future employment to'
accumulate additional benefits. If the award is to stand, the
wife will have no alternative but to sell the home.[14] Unlike an
earlier temporary order, the judgment does not provide for the
continuation of any life insurance on the husband's life, and
if the husband should die, the wife's only assets available for
her future support will be the unspent proceeds, if any, after
payment of debts, from the sale of the house. The equal division
of assets does not put the wife in an approximately equal
position; she will be forced to liquidate and consume her share
of the award.

What has gone awry is that traditional principles of alimony
have been overshadowed by the notion of strict equality of
assets. While equitable division may involve considerations
other than those determinative of alimony, see *Putnam* v. *Put-
nam*, 5 Mass. App. Ct. 10, 15 n.6, and 17 (1977), an order
for division of property cannot be viewed apart from alimony.
See *Crossman* v. *Crossman*, 14 Mass. App. Ct. 966, 968
(1982); *Dewan* v. *Dewan*, 17 Mass. App. Ct. 97, 103 (1983).
The amendment of G. L. c. 208, § 34, in 1974 empowered
the court to "deal broadly with property and its equitable divi-
sion in ways not previously authorized." *Bianco* v. *Bianco*,
371 Mass. 420, 422-423 (1976). *Maze* v. *Mihalovich*, 7 Mass.
App. Ct. 323, 325 (1979). It was not intended to reduce tra-
ditional alimony awards which took the form of orders for
lump sum payments or the conveyance of real estate. See, e.g.
*Surabian* v. *Surabian*, 362 Mass. 342, 348 (1972); *Topalis* v.
*Topalis*, 2 Mass. App. Ct. 530, 531-532 (1974).

---

[14] It is questionable whether she will be able to find another smaller shelter
which will cost her less than her current mortgage and maintenance expenses.

The focus of any financial award must include "the crucial issue in an alimony dispute, namely, the [spouse's] need for support and maintenance in relationship to the respective financial circumstances of the parties." *Partridge* v. *Partridge*, 14 Mass. App. Ct. 918, 919 (1982). The standard of need is measured by the "station" of the parties — by what is required to maintain a standard of living comparable to the one enjoyed during the marriage. See *Rice* v. *Rice*, 372 Mass. 398, 402 (1977); *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. 1, 14 (1979); *Belsky* v. *Belsky*, 9 Mass. App. Ct. 852 (1980); *Meghreblian* v. *Meghreblian*, 13 Mass. App. Ct. 1021, 1022-1023 (1982).

Because we conclude that the combination of alimony and equitable division did not provide a financial arrangement which adequately addressed the wife's needs for support measured by the parties' "station," we reverse the judgment and remand the case for the framing of a more suitable award. The present order of alimony is, however, to stand until any revision is made by the probate judge.

3. *Proceedings on remand.* Without intending to confine the judge's considerable discretion, we offer the following comments as a guide on remand.

(a) *Hearings.* Although more than fifteen months have passed since the last hearing, the judge, in his discretion, may decide to revise the judgment without additional testimony. Unless there is a persuasive showing of a material change in circumstances by affidavit or otherwise, this course may be appropriate because of the bitterness and niggling of counsel which resulted in the "excessive length" of the trial and which "worked a hardship on the litigants, counsel and the court."

(b) *Counsel fees.* Our cases, recognizing a spouse's need for adequate legal representation, have noted that this need "is not materially different from those other needs . . . . which fall within the more common meaning of alimony or support." See *Goldman* v. *Roderiques*, 370 Mass. 435, 437-438 (1976); *Borgarello* v. *Borgarello*, 388 Mass. 652, 654 (1983); *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. at 17 (1979). Also "[n]ot to be ignored is the unremitting opposition that [the wife's] counsel had to face," see *Kennedy* v. *Kennedy*, *ante* 559, 563 (1985),

and the husband's "intransigence in revealing his assets." Cf. *Pemberton* v. *Pemberton*, 9 Mass. App. Ct. 9, 15 (1980). The judge, on remand, may well consider that a more generous payment for reasonable counsel fees is in order.[15] The judge should "also consider what award should be made for services in connection with the instant appeal[]." *Kennedy* v. *Kennedy*, *ante* at 563-564.

(c) *Wife's ability to work.* The judge found that the wife, despite her arthritis and her claim that she is unable to stand on her feet for any extensive period of time, "is capable of working part-time to help subsidize her needs." We think it unrealistic and inappropriate to expect a fifty-nine year old woman, without any significant job experience or training, who has worked only sporadically at part-time jobs, to make up in the market place what her husband plainly has the ability to provide. See *Zildjian* v. *Zildjian*, 8 Mass. App. Ct. 16-17 (1979). "Although wives today may be less economically dependent on their husbands than was the case in the past" the wife here "is a woman who has sacrificed her earning capacity to her marriage and who, as an equitable and practical matter, must look to her former husband for financial support." See *Bell* v. *Bell*, 393 Mass. 20, 26 (1984) (Abrams, J., dissenting). In any event, the fact that the wife may, with her own earnings together with alimony, be able to provide for her minimum needs, does not mean that this is the maximum she is entitled to receive after thirty-two years of contributing equally to the marriage.[16] Her standard of living during the marriage was

---

[15] The judge's findings do not indicate that he regarded the total counsel fee as unreasonable or excessive. We do not suggest that where a spouse's counsel fees are to be borne directly or indirectly by the other spouse, the judge may not use his sound discretion in limiting the counsel fee figure to one which is reasonable in all the circumstances.

[16] We do not intend to suggest that the earning capacities of a spouse are unimportant. We only note that when the pattern of a lengthy marriage was such that the wife rarely worked, she cannot be expected in the "station of life" of these parties, to fill the gap in income.

considerably higher than her minimum needs, and the husband can here afford greater payments.[17]

(d) *Present protection to the wife*. The husband's poor record keeping and evasiveness concerning his finances, see note 4, *supra*, suggest the advisability of giving the wife greater immediate protection and as much independence from the husband as possible.[18] For this purpose a lump sum alimony award in addition to periodic payments should be considered. Such an award is also appropriate in view of the husband's ill health and the wife's lack of any retirement benefits. See *Surabian* v. *Surabian*, 362 Mass. at 348; *Topalis* v. *Topalis*, 2 Mass. App. Ct. at 532. Elimination of the second mortgage may be viewed as the equivalent of a partial lump sum alimony award. The judge should also consider the possibility of requiring the husband to prepay at a rapid rate, or at least fund the payment of the first mortgage so as to provide the wife with a financial cushion for the future. Requiring the husband to maintain the wife as the beneficiary of any life insurance policies may also be in order.

(e) *Husband's finances*. The preceding discussion is based on the judge's finding that the husband's annual income after expenses but before taxes exceeds $100,000. While, as indicated earlier, that finding is not clearly erroneous, we think in this case the figure need not have the normal constraining effect. This is because the uncertainty surrounding the husband's income and assets is his own doing; the production of records is a matter entirely within his control. It has been shown that the husband's income in 1980 *after* taxes exceeded

---

[17] The husband urges that his income is likely to fall because executives of Raytheon became involved in this litigation. He claims the judge took this possible decline into account in making the award. The judge's comments at the end of trial indicate that he could not determine whether the husband's income had, in fact, been adversely affected by the divorce proceedings. In view of the history of increases in gross sales, the possible reduction should be taken into account only if the husband can affirmatively show changed circumstances, but not otherwise.

[18] It has also come to our attention that the docket of the Probate Court subsequent to this appeal shows that the husband has been found in civil contempt for failure to pay the wife the amounts ordered by the probate judge.

$100,000, that his gross sales since that date have steadily increased, see note 5, *supra*, and that his life style after separation from his wife included a $42,500 pleasure boat, a Cadillac and other indicia of a high standard of living. In these circumstances, the judge may assume that a husband who has been evasive about his finances has the means to support his wife of thirty-two years in the station of life they formerly maintained. See *Kane* v. *Kane*, 13 Mass. App. Ct. 557, 559 (1982). Cf. *Pagar* v. *Pagar*, 9 Mass. App. Ct. 1, 7-8 (1980). Each spouse in a divorce proceeding has the obligation to provide adequate financial data to the other spouse and to the court. A judge is entitled, barring special circumstances, to draw all reasonable inferences against a party who fails to do so.

The foregoing suggestions are not dispositive and are only intended to amplify our conclusion that the financial arrangement as a whole must be equitable.

The judgment is reversed, and the case is remanded to the Probate Court for further proceedings consistent with this opinion.

*So ordered.*