EDITH JOHNSTON vs. RONALD R. JOHNSTON.

No. 93-P-503.

Worcester. May 20, 1994. - May 12, 1995.

Present: ARMSTRONG, PERRETTA, & GREENBERG, JJ.

*Evidence*, Credibility of witness. *Divorce and Separation*, Division of
property, Alimony.

In a divorce proceeding the probate judge properly exercised his discretion
under G. L. c. 208, § 34, in making a division of the marital property
[533-537], and he properly, in addition, made an award of alimony to
the wife [537-538].

COMPLAINT for divorce filed in the Worcester Division of
the Probate and Family Court Department on July 23, 1986.

The case was heard by *Arline S. Rotman*, J.

*Michael P. Angelini* for Ronald R. Johnston.

*William Link, III*, for Edith Johnston.

ARMSTRONG, J. This divorce action is before us on the hus-
band's appeal from the provisions of the judgment nisi.

The parties married in 1967 and had three sons who
ranged in age from twelve to sixteen years when the parties
separated in 1986. The wife filed her complaint for divorce
that same year, and obtained a temporary order, incorporat-
ing stipulated terms that barred the parties from transferring
or encumbering any interest in real estate or stock, except by
agreement or court order. The wife was to receive $1,000 per
week (later raised to $1,250[1]) which adequately covered the
household expenses for her and the three boys (the marital
home, assessed at $186,000, had no mortgage) in the rela-

---

[1]The same April, 1991, order that raised the weekly support payment
extended the 1986 injunction against transfers of real estate to include real
estate "owned by any business, corporation or business entity which is
owned or controlled by the [h]usband."

tively modest middle income lifestyle which they had enjoyed before the separation.

That lifestyle belied considerable wealth. The husband, who was not a college graduate, was a capable and successful entrepreneur. Beginning in the mid-1970s, he had started a number of businesses,[2] the most important of which to this appeal was Depot Distributors, Inc., located primarily in Fitchburg, the principal business of which is (or was, prior to a posttrial bankruptcy) the distribution of Merrilat kitchen and bathroom cabinets. Depot was the leading distributor of Merrilat products in the nation, and the husband, in the years leading up to and for a period after the separation, realized annual incomes in amounts approaching or exceeding $1 million. The husband often invested his earnings in real estate, some commercial and some residential, most of which stood in his name alone. The real estate held by the parties individually or jointly was appraised one year before the trial in 1991 at a figure of $11,790,000, subject to mortgages totalling $4,966,343. The judge, however, found that she could not put a reliable value on the marital estate, partly because some of the appraisals were outdated, and the parties did not present more current evidence, and partly because she had rejected both parties' estimates of the value of the husband's business interests, particularly Depot. (The wife had been a fifty-percent shareholder in Depot before the separation, but the husband had persuaded her shortly before declaring a $1,000,000 dividend to transfer her shares to him for no consideration.)

The husband presented himself at the trial as one who had been successful in the past but whose business fortunes had taken a severe turn for the worse due to an economic downturn that adversely affected New England generally, and his business particularly. In an effort to save the business, he had

---

[2]Other businesses he started are referred to in the judge's findings as Wachusett Lumber, Inc.; Kitchen & Bath Salvage, Inc.; Scratch & Dent Corp.; Depot Distributors of the Southeast, Inc.; Johnston Properties; Johnston Leasing; Realty Classics, Inc.; Greenland Air and Water; and Lobster Connection, Inc.

incurred very substantial debt and had been forced to encumber or transfer business-related properties that previously stood in his own name to secure Depot's lines of credit (although such transfers violated the 1986 stipulation).

The husband's complex financial dealings were difficult to understand, and the judge in the end accepted the wife's view that much of the complexity was for the purpose of obfuscation and that the husband's financial straits were not as dire as he made them out to be. The upshot was a judgment nisi that made permanent the $1,250 weekly support payment the wife had been receiving and awarded to her real estate, including the marital home, valued at roughly two and one-half million dollars;[3] half (roughly $200,000) of the husband's profit sharing account at Depot; and lump sum cash payments totalling $175,000. The judge characterized this as roughly a sixty-forty split with respect to real estate (i.e., sixty percent for the husband and forty percent for the wife) and a fifty-fifty split with respect to personal property.

The husband, on appeal, characterizes the sixty-forty ratio as being the stated rationale for the division and argues that the division, properly analyzed, does not conform to it but is instead vastly more favorable to the wife. What the judge has done in effect, the husband argues, is to give the wife three million dollars, roughly, in unencumbered real and personal property, plus a substantial alimony income that by itself meets all her needs, while the husband is left with heavily mortgaged real estate, a failed business, very substantial business debts,[4] and a negative income.[5] Indeed, he points

---

[3]The appraised or agreed values of the real estate assigned to the wife totalled $2,446,000. One parcel was subject to a small mortgage, $8,700, for a net value of $2,437,300. The properties assigned to the husband were appraised at $9,314,000, but were subject to mortgages of $4,966,343, for a net value of $4,347,657.

[4]The husband's business debts include a $1.8 million debt to Safety Fund Bank, a separate $222,000 debt to the same bank, and a claimed debt of $354,000 to Depot. In addition the husband personally guaranteed a $2 million corporate debt to Merrilat.

[5]The husband's income was reported to be $543,382 in 1985, $820,439 in 1986, $1,919,713 in 1987, and $1,462,712 in 1988. The husband reported a negative income of $1,412,763 in 1989, and $2,525,154 in 1990.

out, four of the parcels of real estate attributed to him for purposes of equitable division and included in his so-called sixty percent share do not even belong to him, but rather to Depot, and are directly subject to the claims of Depot's creditors.[6]

We do not read the sixty-forty ratio, however, as the rationale for the judge's decision. Rather, we understand the judge's reasoning to have been as follows. When the divorce proceedings began in 1986, the parties had, in addition to the husband's businesses, real estate held in their personal names (mostly the husband's) of uncertain value, but apparently, based on the 1990-1991 appraisals, worth something in the order of $11 million or $12 million, subject to relatively small encumbrances (apparently in 1986 not in excess of $3,100,000). The wife attempted to protect this real estate for purposes of division by securing a court order, incorporating stipulated terms, enjoining the husband from transferring or encumbering the properties without prior court order.[7] After the separation, however, the husband embarked on a binge of high living, first with one female companion, then

---

Despite these losses, largely those of Depot, a Subchapter S corporation that passes the losses through to the husband for income tax purposes, the husband had a considerable cash income that, because of the Depot losses, came to him without payment of taxes. His rental income in 1990, for example, was $402,218, and his income from leases of machinery and equipment (through Johnston Leasing) was $50,583. In addition, by transferring real estate to Depot in 1990, so as to increase his basis therein, he realized carry-back tax refunds of $403,404 in 1989 and $632,000 in 1990. His businesses, moreover, financed most of his personal expenditures, including residences and automobiles.

[6]The four parcels were appraised at $3,329,000. Together they constitute more than three quarters of the net value of the real estate assigned to the husband (see note 3, *supra*).

[7]Once, in 1991, this procedure was used. The husband obtained permission to sell property in Roanoke, Virginia, the proceeds to be held in escrow. But, before that, the husband transferred four parcels to Depot, without securing permission, and, apparently in 1990, he put a mortgage of $1,900,000 on another piece of property — a warehouse in Greenland, New Hampshire. This property was acquired after the separation in 1989 but was originally held free of mortgage. It does not appear clearly whether the mortgage violated the terms of the 1986 injunction. The proceeds were used in part to fund the investment loans mentioned later in the text.

with another, taking frequent Caribbean vacations, and purchasing homes far more sumptuous than the marital home. On Depot's account and Johnston Properties' he invested in a succession of business ventures (or loans to friends in business ventures), all of which — for a total of roughly $1.5 million — were presented as being unrecoverable. In violation of the injunction he transferred four previously unencumbered parcels of land to Depot, totaling over $3 million in value (see note 6, *supra*).

The judge's reaction to this activity was that it should not be charged against the wife's fair share of the marital estate. "After the parties' separation, other than paying support to the wife, the husband disregarded the marital enterprise. He embarked on a pattern of business expansion and transactions and personal expenditures which were wholly personal to him and which now jeopardize the wife's claim for an equitable division of marital assets." It was the unilateral character of the shrinkage of marital assets that was of concern to the judge. As she emphasized, "This was all done without notice to or consultation with the wife." Thus the judge charged the shrinkage against the husband's share.

There were other elements to the rationale, but they also are not in our view central to the judgment. The judge made clear that she thought the husband's testimony was less than candid. Compare *Grubert* v. *Grubert*, 20 Mass. App. Ct. 811, 822 (1985); *Amrhein* v. *Amrhein*, 29 Mass. App. Ct. 336, 342 n.4 (1990). She obviously suspected that many of the money-losing business transactions were shams. She thought that the husband had not lost his once sure business touch, and that, after the divorce, he would succeed in making his businesses profitable again.

Much of the husband's argument is devoted to showing that the husband's decision to transfer personally owned real estate to Depot was a rational business judgment to try to save a once profitable but now precarious business enterprise and that the judge's finding (or conclusion) to the effect that the husband would be able to make Depot profitable again and her implicit finding that Depot had some positive value

were clearly erroneous. The argument fails for two reasons. First, the judge's conclusions were, in effect, based on an assessment of the husband's credibility, and the credibility of a party or other witness who appeared at trial is quintessentially the domain of the trial judge, in which the judge's assessment is close to immune from reversal on appeal except on the most compelling of showings. See *Goddard* v. *Dupree*, 322 Mass. 247, 248 (1948); *Palmer* v. *Palmer*, 23 Mass. App. Ct. 245, 252 (1986). Second, even if we were inclined to second guess that judgment, which we are not, it is immaterial to the division, which, as we read it, turns on the unilateral character of the husband's post-1986 business and real estate dealings. Having obtained the entry of a court order protecting something in the order of at least $7 million net of personally held real estate from being reached by the husband unilaterally, the wife should be entitled to have her share of an equitable division based on that amount at least. If the asset pool is smaller, that was the husband's doing, and it was not an injustice to him to disregard the shrinkage.

The judge's division awarded to the wife parcels of real estate not encumbered or transferred after 1986. She awarded to the husband the four parcels that he transferred to Depot and then encumbered with business debt. Similarly, he received the Greenland, New Hampshire property on which he had placed a $1.9 million mortgage around 1990 (see note 7, *supra*). He was awarded all of his business interest intact,[8] without any assignment of value. The balance of the award to the wife, the equal division of the husband's profit sharing plan and the lump sum payments brought her share to $3 million roughly — hardly a disproportionate share of the seven million, roughly, that should have been insulated from the claimed wreckage of the husband's business dealings. We do not fault the judge's solution; to the

---

[8]The judge made one incursion into the business, awarding to the wife a building in Fitchburg used by Depot but owned by the husband without mortgage. This was necessary, the judge felt, to bring the wife closer to an equitable share.

contrary, it seems to us to have been both wise and just to both parties.

The husband objects also to the $1,250 weekly alimony award. His argument is that the judge specifically found that the $1,250 support that had been paid weekly during the many years the divorce action was pending was adequate to meet her needs. During those years she owned almost no property. With her equitable division estate of $3 million, she has the resources to generate income several times larger than the support on which she lived comfortably. Citing *Grubert* v. *Grubert*, 20 Mass. App. Ct. at 818, the husband argues that alimony should not be viewed apart from the division of the marital estate. This is true; the adequacy and reasonableness of an award must be viewed in its entirety, and in some cases judges have reasonably eliminated periodic alimony altogether, relying instead on a lump sum alimony award or an equitable division that can generate sufficient income for the spouse's needs. Many considerations shape the structure of an award. If a divorcing couple's principal asset is income-earning potential, a judge will necessarily rely principally on periodic alimony. Where couples have amassed a sizeable estate, a judge may rely mostly on a division of assets. Here, the real estate which the wife obtains by division, despite being unencumbered, may not be entirely secure, because the wife at one time executed a guarantee of certain of Depot's debts.[9] That consideration alone might warrant reliance on continued alimony. In any event the *Grubert* decision cannot be read to say that alimony is inappropriate if the receiving spouse can generate comparable income from the estate awarded her by division. See *Rosenberg* v. *Rosenberg*, 33 Mass. App. Ct. 903, 904 (1992). In effect, the husband's argument is only a retread of his primary contention that the wife received too much. She did not. There is no principle of law that consigns the wife irreversibly to the modest living circumstances that marked her and her husband's lives together before the separation. It is

---

[9]The judgment nisi included an indemnity provision in the event that the wife should be held liable for business debts based on her guarantee.

not unfair that she be able, like him, to enjoy a more opulent lifestyle made possible by the frugality of their building years.

.                                             *Judgment affirmed.*